**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Montgomery Ward, et al.,** | ) | **CASE NO. 1:09 CV 415** |
| | ) | |
| **Plaintiffs,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| **vs.** | ) | |
| | ) | |
| **County of Cuyahoga, et al.** | ) | **Memorandum of Opinion and Order** |
| | ) | |
| **Defendants.** | ) | |

**INTRODUCTION**

This matter is before the Court upon defendant Cuyahoga County's Motion for Summary Judgment (Doc. 25) and defendant Michael Sparks's Motion for Summary Judgment (Doc. 26). This is a civil rights dispute. For the following reasons, defendant Cuyahoga County's motion is GRANTED and defendant Sparks's motion is GRANTED in part and DENIED in part.

**FACTS**

Plaintiffs, Montgomery Ward, Jamie Sutton, and Jamie Sutton as next friend of minor Daisy Ward, bring this action against defendants, Cuyahoga County and Sergeant Michael Sparks, alleging that defendants violated plaintiff Ward's civil rights through the use of

excessive force in connection with the execution of a search warrant at his apartment on February 5, 2008. Plaintiffs also allege that defendant Cuyahoga County failed to properly train and supervise its SWAT team members.

A high-risk search warrant was issued for plaintiffs' residence on February 1, 2008, for items used in the violation of Ohio's drug laws. (O'Connor Depo. 20:21-24.) According to Detective Timothy O'Connor, a narcotics detective in the Cuyahoga County Sheriff's Office, the warrant was designated as "high risk" because plaintiff Ward was believed to be trafficking large quantities of marijuana and to possess several guns, along with having a criminal history involving drug trafficking. (Id. at 38:20-40:5.) The SWAT team assembled to execute the warrant early in the morning on February 5.

Lieutenant Donald Michalosky, the senior officer in charge of the SWAT team, testified as to the training and qualifications of SWAT team members. (Michalosky Depo. 5:5-7.) Members of the Cuyahoga County Sheriff's Department who apply to be on the SWAT team are required to pass a physical fitness test and a firearms qualification test, and undergo an oral interview. (Id. at 21:8-11.) While no specialized training is required prior to joining the SWAT team, once a member joins the team the member is familiarized with policies and procedures, receives additional training on SWAT weapons and equipment, and attends basic SWAT school at the first available opportunity. (Id. at 22:10-22.) SWAT team members receive additional ongoing training. The target goal for such training is 16 hours per month, but team members generally receive about eight hours of training each month. (Id. at 23:2-15; Sparks Depo. 142:21-143:5; Engelhart Depo. 15:3-5.) The training includes a variety of topics and "encompasses every manner of confrontation between a deputy and a suspect [.] And tries to

encompass every manner of scenario where the use of deadly force decision has to be made." (Michalosky Depo. 62:10-14.) Training on encountering suspects during entries is routinely done. (Id. at 62:19-25.)

Prior to executing the warrant, the SWAT team held an Operational Plan Meeting, during which the team was informed of plaintiff Ward's prior criminal history, including drug trafficking, carrying a concealed weapon, domestic violence, and aggravated burglary. The team was also informed that Ward may have guns at his house. (Id. at 36:1-38:6; Sparks Depo. 53:4-54:22.)

The SWAT team arrived at Ward's house at approximately 6:39 a.m. on February 5. It was dark and raining. (Defendants' Ex. G.) The SWAT team members were dressed in Kevlar helmets and vests and armed with their sidearms, and some team members had additional weapons. (Engelhart Depo. 21:17-22:2; 37:2-6; defendants' Exhibit G.) Several of the SWAT team members assembled on the small porch. The porch is approximately five to six feet wide from the front door of the house to the back of the porch, with the porch entrance at a right angle to the front door. (Sparks Depo. 70:22-24; Defendant's Ex. E.) Defendant Sparks, the team leader, was positioned on the porch with his back against either a post or the handrail of the porch. (Sparks Depo. 70:19-21.) He stood with a Colt AR15 rifle aimed at the door and the safety off, though he testified that his finger was not on the trigger. (Id. at 68:4-22; Defendants' Ex. G.) The rifle was on a strap around his shoulder. (Sparks Depo. 79:8-11.) Deputy Perpar, the secondary breacher, was in front of the door. (Perpar Depo. 15:10-18:17.) Deputy Miller, the primary breacher, was positioned in front of Perpar off to the side of the door. (Miller Depo. 24:20-21.) Deputy Engelhart, the first entry person and cover person, was just off the porch to

the right of the door, and may have had one foot on the porch deck. (Engelhart Depo. 44:10-24.) He was armed with an MP5 submachine gun. (Cox Depo. 33:16-20.) Deputy Bottone, the second entry person, testified that he was behind Deputy Engelhart at the edge of the porch. Bottone was assigned to deploy a flash-bang distraction device once the door to the house was breached. (Bottone Depo. 20:24-25; 24:1.) He was also armed with an MP5 submachine gun. (Cox Depo. 34:2-3.) Deputy Cox was off of the porch, positioned at its corner, behind Deputy Smith. Cox was armed with a bean bag shotgun. (Id. at 19:5-14; 36:11-17.)

Perpar testified that as a secondary breacher he carried a haligan tool, which is a tool with a spike at one end and a hammer claw at the other end designed for prying open security doors that open outward. (Perpar Depo. 14:8-24.) In this instance, however, Perpar testified that the security door, which opened to the left, was unlocked so he simply opened it and held it open with his leg, standing to the left of the front door. He pounded on the door several times and simultaneously announced "police" and "search warrant." (Id. at 15:10-18:12; Sparks Depo. 69:11-15.) He then moved out of the way so that Miller, the primary breacher, could position himself to breach the door with a battering ram. (Perpar Depo. 18:16-17.) Approximately eight to fifteen seconds after Perpar knocked and announced the police presence, defendant Sparks ordered Miller to breach the door. (Id. at 18:18-21; Sparks Depo. 70:8-9; 123:19-124:19.) Perpar testified that Miller hit the door twice because it didn't open all the way the first time. (Perpar Depo. 19:22-20:9.) Perpar waited for the flash-bang device to be deployed. He was looking at the door. (Id. at 20:25-21:1.) With his peripheral vision, he saw Ward coming towards the door "at a good clip," then he turned where he could not see Ward anymore. He then heard a pop and saw Engelhart laying Ward on the porch. (Id. at 21:6-10; 22:19-24.)

Perpar further testified that he did not remember anyone saying anything prior to the pop sound. (Id. at 29:5-8.)

Miller testified that he hit the door once with the ram and it opened approximately 45 degrees. He nudged it again with the ram and opened it to almost 90 degrees. (Miller Depo. 26:8-13.) He could see inside the house but did not see anyone. (Id. at 27:18-21.) He backed out of the way and turned around to put the ram down, and heard a pop. (Id. at 27:23-24.) When he turned back around to grab his gun so that he could enter the house, he saw Engelhart laying Ward down on the porch. (Id. at 28:6-8.)

Bottone testified that when preparing to use a flash-bang distraction device, protocol requires that the person deploying the device look inside the house to make sure that it is safe to deploy the device. (Bottone Depo. 26:22-27:1.) The device is not designed to be used in an area with flammable liquids or children, or where it could hit a person. (Id. at 33:6-13.) To make sure the area is safe, the person responsible for deploying the device employs a technique known as a "quick peek" where the person uses the side of the house for protection as he quickly looks in, without placing his body in the door opening where he is more likely to be shot if an armed suspect is present in the home. (Id. at 27:2-15.) He testified that as he was standing behind Engelhart, he heard someone knock at the door but did not know who it was, nor did he see who breached the door, as he had to "sling" the MP5 rifle that he was carrying and prepare the distraction device for deployment. (Id. at 28:11-13.) He heard the door being breached and broke the ring safety seal on the distraction device by a quarter of a turn. He looked quickly at the door, saw that it was open, and saw that it started to close again. Bottone then looked back down at the distraction device "for a second" to make sure the ring was free. Bottone then

testified that he focused on the door and someone pushed it open again, not all of the way, but enough that he could see inside. (Id. at 28:13-23.) He was "peeking" around Engelhart who was still in front of him. (Id. at 28:5-6.) He testified that as he was looking inside, he saw a silhouette moving rapidly towards the door, and in a "split second" determined that it was not safe to deploy the distraction device. (Id. at 28:25-29:6). He immediately turned away from the door, "tucked in behind Engelhart," and protected his weapon and the distraction device. (Id. at 29:14-17.) He testified that as he was turning away, he could see out of his peripheral view an individual coming through the doorway and just breaking the threshold, and then when he turned back around, someone was laying on the porch. He testified that it happened very quickly. (Id. at 29:21-25.) He believes he heard a gunshot during this event, after he turned away from the door to take cover behind Engelhart. (Id. at 30:11-14.)

Defendant Sparks testified that once Perpar and Miller had completed their breaching duties he was the cover man for the rest of the team members. (Sparks Depo. 71:13-16.) After the door was breached, he looked at Deputy Bottone because Bottone was responsible for deploying the distraction device. He testified that he looked into the house and could see clearly to the back of the residence where there was an ambient light source, and he did not see anyone. (Id. at 71:17-23.) As he was "holding on to that area and in anticipation of Marc Bottone and the deployment of the flash bang grenade," he saw a person, later identified as plaintiff Ward, "coming out of the shadows" and approaching him "in a hurried fashion." (Id. at 72:12-17.) Sparks testified that he loudly yelled at Ward to "back off,"[1] but the individual did not comply

[1] Sparks testified to the following:

Q. Okay. And then you yelled, back off. Did you yell it

and continued to move toward Sparks, closing "the gap between him and [Sparks] in a very short matter of time." (Id. at 72:18-20.) Sparks later testified in the same deposition that "[t]he door was breached and within a split second the figure came rushing toward the door." (Id. at 102:9-14.) When Ward reached the threshold of the door, Sparks shot him in the face because "in [his] opinion he was lunging at [his] weapon"[2] and was "within three feet of the muzzle of [his] gun."

---

loudly?

A. To the best of my recollection, yes, sir.

Q. And it would be important; I mean, you were obviously concerned, according to what you are saying.

A. Yes, I was.

Q. It would make sense that you would yell it loudly?

A. I certainly didn't whisper it.

Q. Maybe loud enough that the whole neighborhood could hear, right?

A. More than likely. Who was up at that time, I can't say.

Q. Well, there's also the members of your team that were there.

A. That's correct.

Q. Right next to you, around you, correct?

A. Yes.

(Sparks Depo. 128:9-129:1.)

[2] Later in his deposition, while reviewing Sparks's *Garrity* interview statement, Sparks testified to the following:

Q. And then [the statement] says I thought he was lunging

(Sparks Depo. 72:12-24; 102:12-14.) Engelhart then grabbed Ward, who remained standing in the doorway after he was shot, and laid him face down on the porch and handcuffed him. (Id. at 73:3-10.) Sparks testified that he then instructed Deputy Cox to render first aid to Ward, and that Sparks took a blanket off the couch in the front room and covered Ward up, because it was cold and damp and Ward was in his underwear. (Id. at 75:4-13.)

Sparks further testified that as Ward was coming towards him, he was carrying something that looked like a blanket or a pillow which was covering his entire left hand and the left portion of his body. Sparks could not see Ward's left hand clearly. (Id. at 76:22-24; 78:5-

---

for my weapon; is that a correct statement?

A. Yes, it is.

Q. You didn't say he was lunging for my weapon; you said you thought he was.

A. I don't know what his state of mind was, sir.

Q. You can't say that he was lunging for your weapon, correct?

A. He was making an aggressive move.

Q. You can't say, oh, was lunging for my weapon?

A. I don't know what his state of mind was, sir. I don't know what his intentions were. In my mind he was lunging for my weapon.

Q. There's a difference between lunging for a weapon and thinking that he was lunging for my weapon, isn't there?

Mr. Mallamad: Objection. You can answer again.

A. Yes.

15.) Ward's right hand was extended outwards at a shoulder height or higher position as he was walking quickly. (Id. at 78:23-25.) Sparks testified that he did not see a weapon, and that Ward never touched his gun. (Id. at 78:21-22.) Sparks stated that the pillow Ward was carrying was the same pillow that was on the front porch after Ward was shot, although he testified both that the pillow was underneath Ward on the front porch and that the pillow was near Ward on the front porch. (Sparks Depo. 133:25-137:10.)

Deputy Engelhart testified that once the door was breached, he expected the flash-bang distraction device to be deployed, so he put his head down away from the door. Instead of hearing the expected bang, he heard a pop. (Engelhart Depo. 42:23-43:1.) When he looked up about a half-second after he heard the pop, he saw Ward standing in the doorway with his hands coming up to his face. Once Engelhart saw that Ward had nothing in his hands, he grabbed him by the back of the neck and laid him on the floor, out of the way of the door. (Id. at 43:1-8; 60:22-25.) Engelhart testified that he heard the pop within three to five seconds of the door being breached. (Id. at 48:1-4.) He further testified that he did not see a pillow at the time, that Ward did not have a pillow in his hands, and that he did not know how the pillow got on the front porch. (Id. at 54:18-25.)

Deputy Cox testified that a few seconds after the door was breached he heard a shot fired. (Cox Depo. 35:20-21.) He looked to Bottone, who was trying to get the pin back in the distraction device. (Id. at 35:22-24.) Then he saw Ward being pushed out of the doorway, and Cox handcuffed him and began to administer first aid. (Id. at 36:7-10.) He also testified that the only things he heard anyone say prior to the shot were "police" and "search warrant." (Id. at 39:15-19.) He further testified that someone gave him a pillow, and that he put it underneath

Ward. (Id. at 44:19-25.)

Plaintiff Ward testified that on February 4, 2008, he got up from bed at approximately 3:00 p.m., took a shower, dressed, had a marijuana cigarette, and went to the VFW hall in Brookpark for a 5:00 p.m. poker game. (Ward Depo. 67:15-19.) He won approximately $12,000, and came home with between $11,000 and $12,000 in cash. (Id. at 99:13-24.) He testified that he arrived home from the game around 3:00 or 3:30 in the morning on February 5, 2008. (Id. at 68:3-7.) At that time, he came in the house, turned on ESPN, sat on the couch in the living room on the cushion nearest to the front door, took off his clothes, and began to break up marijuana to roll a cigarette. (Id. at 68: 10-15; 76: 5-7.) He testified that he never got around to rolling the cigarette and did not have a chance to smoke it, because he heard his security door "hit" and it was not normal for the security door to be open. (Id. at 69:4-7; 78:8-16.) He thought that the wind blew it open, and testified that the weather outside at the time was bad. (Id. at 80:18-81:2.) He got up from the couch intending to close his security door. (Id. at 81:6-8.) Ward further testified that he had nothing in his hands when he got up to answer the door, and that it took him two to five seconds from the time he got off of the couch to get to the front door. (Id. at 81:12-21.) Ward went to the front door, put his left hand on the door handle, and as soon as he opened it he saw a flame shoot at his face. (Id. at 78:17-19). His right hand was by his side, as he "had no reason to have [his] hands up." (Id. at 98:11-19.) He testified that "[a]fter that all my teeth was all over, blood was going everywhere, and they just drug me to the ground." (Id. at 78:20-21.) He testified that he believes his door with hit with something causing it to break at the same time that he opened it, although he did not see anyone break his door, nor did he hear the door getting hit. (Id. at 96:6-97:22.) Immediately after he was shot, he

remained standing until Engelhart took him to the ground. (Id. at 86:20-87:11.) He also testified that Cox properly administered first aid. (Id. at 80:3-5.) Ward remained in the hospital for over a month. (Id. at 112:23-113:6.)

Ward testified that since the shooting, he is unable to play with his children like he used to because he is in terrible pain, he experiences side effects such as mood swings from the drugs that he must take, and he is embarrassed to go anywhere in public, especially swimming, because he has a feeding tube. (Id. at 135:20-136:14.) Additionally, he is unable to work and is experiencing financial difficulties. (Id. at 136:15-16.)

Jamie Sutton, Ward's live-in girlfriend, was asleep in her bedroom at the time Ward was shot. (Sutton Depo. 8:7-11.) Sutton's older daughter, Allysun, was also in the house, as was Ward and Sutton's infant daughter Daisy, who was 18 months old at the time. Sutton testified that for a time after the event, Daisy would not go near her father, she did not recognize him, and that he scared her. (Id. at 61:18-19.) She also testified that since the event Daisy is clingy, confused by her father's appearance, and does not like to sleep alone. (Id. at 61:16-23.)

The complaint contains seven claims for relief. Count one is claim that defendants violated 42 U.S.C. § 1983 through the use of excessive force. Count two is a claim for assault and battery. Count three is a claim that defendants violated 42 U.S.C. § 1983 through an unreasonable search and seizure. Count four is a claim for municipal liability under 42 U.S.C. § 1983. Count five is a claim for reckless and wanton conduct. Count six is a claim for negligent infliction of emotional distress. Count seven is a claim for loss of consortium.[3]

---

[3] Plaintiffs indicate in their opposition brief at page 16 they will no longer press the unreasonable search and seizure claim or plaintiff Sutton's loss of consortium claim. Indeed, the brief only opposes defendants' arguments on plaintiff Ward's claim of excessive

Defendants now move for summary judgment, arguing that they are immune from suit. Plaintiffs oppose the motion.

**STANDARD OF REVIEW**

Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (citing Fed. R. Civ. P. 56(c)). *See also LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). The burden of showing the absence of any such genuine issues of material fact rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)). A fact is material only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden shifts to the nonmoving party:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule,

---

force, plaintiff Ward's state law claims of assault and battery and reckless and wanton conduct, plaintiff Sutton's claim of negligent infliction of emotional distress, plaintiff Sutton's claim of loss of consortium as next friend of Daisy Ward, and the claim of municipal liability. Accordingly, defendant Sparks's motion for summary judgment as to count three, unreasonable search and seizure, is granted and as to count seven, loss of consortium, is granted only as to Jamie Sutton's claim. Daisy Ward's loss of consortium claim under count seven is discussed *infra*.

> must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed. R. Civ. P. 56(e). The court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party. *Cox v. Kentucky Dep't. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (citing *Anderson*, 477 U.S. at 255). *See also United States v. Hodges X-Ray, Inc.*, 759 F.2d 557, 562 (6th Cir. 1985).

Summary judgment is appropriate when a party who bears the burden of proof at trial fails to make a showing sufficient to establish an essential element of his case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. at 322). When the nonmoving party bears the burden of proof, "the burden on the moving party may be discharged by 'showing'– that is, pointing out to the district court– that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. "The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995) (quoting *Anderson*, 477 U.S. at 252). Moreover, if the evidence is "merely colorable" or is not "significantly probative," the court may grant summary judgment. *Anderson*, 477 U.S. at 249-50.

## ANALYSIS

### A. Count One: Excessive Force

Qualified immunity protects a government official from liability for damages if the official's conduct in performing a discretionary function does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v.*

*Callahan*, 129 S. Ct. 808, 815 (2009); *Schreiber v. Moe,* 596 F.3d 323, 329 (6th Cir. 2010). Qualified immunity is immunity from suit rather than a mere defense to liability, and "applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'" *Pearson*, 129 S. Ct. at 818 (citing *Groh v. Ramirez,* 540 U.S. 551, 567 (2004)). It "gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law." *Chappell v. City of Cleveland,* 585 F.3d 901, 907 (6th Cir. 2009) (citing *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (internal quotations omitted)). The plaintiff bears the burden of showing that the defendant is not entitled to qualified immunity. *Id.* To determine whether a government official is protected by qualified immunity, a court must determine whether the plaintiff has shown facts that constitute the violation of a constitutional right, and whether that right was clearly established in the context of the case. *Pearson*, 129 S. Ct. at 818 (citing *Saucier v. Katz,* 533 U.S. 194, 201 (2001)).[4] In a deadly force case, the plaintiff "must show that the right was clearly established in a 'particularized sense,' such that a reasonable officer confronted with the same situation would have known that using deadly force would violate that right." *Chappell*, 585 F.3d at 907 (quoting *Brosseau v. Haugen,* 543 U.S. 194, 199-200 (2004)).

Under the Fourth Amendment, individuals have the right to be free from excessive force during an arrest, investigatory stop, or other seizure.[5] An excessive force claim is analyzed under the Fourth Amendment's objective reasonableness standard. *Graham v. Connor*, 490 U.S.

---

[4] A court has discretion in deciding which prong of the analysis to address first. *Pearson*, 129 S. Ct. at 818.

[5] The parties do not dispute that defendant Sparks's use of force constituted a seizure governed by the Fourth Amendment.

386, 395-396 (1989). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Id.* at 396 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8 (1985)). Courts are directed to pay careful attention to the facts and circumstances of the case, including "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* These factors are not an exhaustive list, and the ultimate inquiry is whether the totality of the circumstances justifies the force used. *Id.* Reasonableness must be judged objectively from the perspective of a reasonable officer at the scene, and not with the benefit of hindsight or with regard to the officer's underlying intent or motivation. *Id.* at 396-97. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments– in circumstances that are tense, uncertain, and rapidly evolving– about the amount of force that is necessary in a particular situation." *Id.* at 396. An officer's use of deadly force is only reasonable if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others." *Garner*, 471 U.S. 1, 11 (1985). *See also Chappell,* 585 F.3d at 908-909.

The Sixth Circuit applies a time-segmented analysis to excessive force claims. *Livermore v. Lubelan*, 476 F.3d 397, 406 (6th Cir. 2007). In other words, a court should identify the seizure and determine whether the force used during the seizure was reasonable under the totality of the circumstances. *Id.* A court should not consider whether it was reasonable for officers to create the circumstances leading to the seizure. *Id.* (citing *Dickerson v. McClellan,*

101 F.3d 1151, 1161 (6th Cir. 1996)). A court must instead "focus on the 'split-second judgments' made immediately before the officer used allegedly excessive force." *Id.* (citing *Dickerson*, 101 F.3d at 1162).

Defendant Sparks argues that he was faced with a rapidly-evolving and potentially dangerous situation. He argues that the undisputed evidence shows that the front porch of Ward's house was small and confining, the lighting was poor, and that Ward was close enough to his weapon to grab his weapon and potentially take control of it, causing Sparks to fear for his own safety and the safety of his team members. Under these circumstances, Sparks argues, his use of deadly force was reasonable.

Plaintiff Ward argues that material facts are in dispute. Ward points out that although Sparks claims that he yelled for Ward to "back off," no other witnesses corroborate this evidence, and Cox and Perpar testified specifically that they did not hear Sparks say anything prior to hearing the gunshot. Ward argues that while other witnesses described Ward as moving quickly, no other witness provides any support for Sparks's claim that Ward was lunging for his gun, nor do other witness corroborate Sparks's claim that Ward was carrying something in his hand as he approached Sparks. Ward also argues that it is unreasonable for Sparks to claim to have been threatened by Ward coming to the door where the SWAT team had knocked and announced its presence and where the SWAT team was armed, wearing protective gear, and effectively had Ward surrounded. Ward further argues that the search warrant was issued because he was suspected of marijuana possession and distribution, and not of a more serious or violent crime. Additionally, Ward argues he was not an imminent threat and the evidence suggests that he was not actively attempting to resist arrest or flee. Finally, Ward argues that

less lethal measures were readily available to address the threat that Sparks claims Ward posed to him, such as the bean bag gun carried by Cox or the flash-bang device carried by Bottone.

In reply, Sparks claims that the following facts are undisputed: the lighting was poor; Sparks was made aware that Ward had weapons in the home; Sparks was made aware that Ward had a criminal history including carrying a concealed weapon and drug trafficking; Ward was moving aggressively towards Sparks; Ward was at the doorway threshold and within three feet of Sparks's weapon when Sparks fired; the SWAT team members had no immediate means of retreat; events unfolded instantaneously; and Sparks reasonably believed that Ward was moving towards his weapon and that the SWAT team's safety was in jeopardy. Sparks refers the Court to *Chappell* and stresses that the Sixth Circuit in that case found that the officers were entitled to qualified immunity in spite of the facts that the suspect was not within arm's length of the officers; the officers had flashlights; the officers had time to draw their weapons on the suspect; a mattress separated the officers and the suspect; and all of the officers were armed with weapons drawn and able to defend themselves. Sparks further argues that the factual differences between Sparks's account and Ward's account are minor and immaterial. Specifically, Sparks argues that whether Ward was rapidly approaching, had his arm extended, or was lunging for a weapon is a distinction similar to that rejected by the *Chappell* court. Additionally, Sparks argues that according to *Chappell*, whether Ward had time to comply with Sparks's command to "back off" prior to Sparks firing his weapon is irrelevant because Sparks was faced with having to make a split-second decision regarding his safety and the safety of others.

To determine whether qualified immunity exists, the Court must determine whether the plaintiff has shown facts that constitute the violation of a constitutional right. At the summary

judgment stage, the Court views the facts in the light most favorable to the non-moving party. Upon review, the Court finds that a genuine issue of material fact exists with respect to whether Ward posed an immediate threat to the safety of Sparks or the other SWAT team members. *Graham*, 490 U.S. at 396. *See also Garner*, 471 U.S. at 11 (use of deadly force is only reasonable if "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others").

Because the totality of the circumstances is analyzed in a time-segmented manner in the Sixth Circuit, the relevant circumstances are those facing Sparks at the time he made the decision to shoot Ward. *Chappell*, 585 F.3d at 909; *Livermore*, 476 F.3d at 406. The facts in the light most favorable to Ward are as follows. The search warrant was issued because Ward was suspected of marijuana possession and distribution. The time of the incident was approximately 6:39 in the morning on February 5, 2008. The weather was inclement and it was dark outside. Ward was sitting on his couch on the cushion closest to the front door, breaking up marijuana in preparation for rolling a cigarette, watching television dressed only in his boxer shorts. He heard what he thought was his metal security door banging. He got up from the couch and within two to five seconds he put his left hand on the door knob and opened the door. He held nothing in either his right or left hand, and his right hand was by his side. As soon as Ward opened the door, Sparks shot him in the face. Ward was not moving aggressively toward Sparks, trying to resist arrest or escape, nor was he lunging for Sparks's gun. The evidence suggests that Ward was merely opening the door in response to some noise outside.

The Court agrees with Sparks that it is undisputed that the situation unfolded rapidly. A rapidly developing situation, however, "does not by itself legitimize the use of deadly force."

*Chappell,* 585 F.3d at 910. Although Ward, standing at the threshold of the door at the time he opened it, may have been close enough to the end of Sparks's weapon to touch it given the small area of the porch, this fact without more is not enough to find that Ward posed an immediate threat to Sparks or other members of the SWAT team. Sparks argues that in *Chappell,* the court found qualified immunity to exist even when the plaintiff was not within arm's reach of the police officers. *Chappell* is inapposite. In *Chappell,* it was undisputed that the plaintiff was armed and that the officers gave the plaintiff instructions to come out of his hiding place, less than seven feet away, and show his hands. *Id.* Instead of complying, the plaintiff came out of his hiding place and continued moving towards the officers with a knife held up in his hand. *Id.* Here, Ward was unarmed, held nothing in his hands, and was shot at the same time he opened the door. Sparks also argues that under *Chappell,* it is immaterial whether Ward was moving rapidly or lunging for Sparks's weapon. The facts in the light most favorable to Ward, however, suggest that Ward was not moving aggressively toward Sparks at all and was standing in the threshold of his doorway. Moreover, although Sparks argues that the *Chappell* decision makes it irrelevant whether Ward had time to comply with Sparks's command to "back off" before Sparks fired his weapon, the evidence strongly suggests that Sparks gave no verbal command or warning to Ward to "back off." Under these circumstances, a genuine issue of material fact exists as to whether Ward posed an immediate threat to the safety of Sparks or the other SWAT team members.

Because plaintiffs have established that a reasonable jury could find that defendant Sparks's use of force was objectively unreasonable, the Court must now determine if such a finding by the jury of excessive force would indicate that defendant violated a clearly established

constitutional right.[6] *Pearson,* 129 S. Ct. at 818 (citing *Saucier v. Katz,* 533 U.S. 194, 201 (2001)). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202. Upon review, the Court concludes that plaintiff Ward had a clearly established right not to be subjected to deadly force unless he posed an immediate threat to defendant Sparks or to the SWAT team members. The Sixth Circuit, following Supreme Court precedent, has held that a reasonable officer would understand that he is not entitled to shoot a person who does not pose an immediate threat. *Yates v. City of Cleveland,* 941 F.2d 444, 447 (6th Cir. 1991) ("At the time of the shooting it was clearly established in the Sixth Circuit that Yates 'had a right not to be shot unless he was perceived to pose a threat to the pursuing officers or to others[.]'" (citing *Robinson v. Bibb*, 840 F.2d 349, 351 (6th Cir. 1983))). *See Garner*, 471 U.S. at 11; *Green v. Taylor*, 239 Fed. Appx. 952, 960 (6th Cir. 2007) (finding that "*Garner* 'clearly establishes' the right at issue; that is, the right not to be shot unless the suspect poses an immediate threat to the officers or others").

Accordingly, because plaintiffs have shown facts that establish a violation of a constitutional right, and that right was clearly established, defendant Sparks's motion for summary judgment on qualified immunity is denied at this time.

**B. Count 4: Municipal Liability Claim**

A municipality cannot be found liable for deprivation of a constitutional right unless a plaintiff can establish that an officially executed policy or the toleration of a custom within the

---

6 The parties offer no arguments on this prong of the qualified immunity test.

municipality deprived the plaintiff of that right. *Monell v. Dept. of Soc. Servs*., 436 U.S. 658, 690-91 (1978). Thus, in order to hold a municipality liable, the plaintiff must establish that: (1) a constitutional violation occurred; and (2) the county is responsible for the violation. *Graham v. County of Washtenaw*, 358 F.3d 377, 382 (6th Cir. 2004) (quoting *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978)).

Liability may be imposed upon a municipality on the basis of failure to train, where the "failure to train amounts to deliberate indifference." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 900 (6th Cir. 2005). "To succeed on a failure to train or supervise claim, a plaintiff must prove the following: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006) (citing *Russo v. City of Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992)). "There must be a 'direct causal link' between the policy (or lack of policy) and the alleged constitutional violation such that the County's 'deliberate conduct' can be deemed the 'moving force' behind the violation." *Graham*, 358 F.3d at 383 (citing *Waters v. City of Morristown*, 242 F.3d 353, 362 (6th Cir. 2001)).

Defendant Cuyahoga County argues that the evidence shows that SWAT officers are adequately trained in weapons, equipment, and the policies and procedures of the Cuyahoga County Sheriff's Department. The County also argues that plaintiffs have introduced no evidence of prior instances of unconstitutional conduct demonstrating deliberate indifference to inadequate training. Finally, the County argues that plaintiffs are unable to link any inadequacies in training or supervision to the actual injury in this case because no inadequacies

existed.

In response, plaintiffs offer the expert report of Larry Danaher, a national police instructor and retired captain from the Lafayette, Indiana police department. Plaintiffs argue that the record reflects that the County Sheriff's Department has few governing policies, inadequate training, and virtually nonexistent supervision and oversight. Plaintiffs point out that the 2008 SWAT annual report does not mention the incident involving Ward and represents a conscious attempt to ignore it or even cover it up. Plaintiffs also state that Lieutenant Michalosky, the senior SWAT supervisor, did not produce a report supporting his conclusion that the SWAT policies did not need to be changed following his informal investigation of this incident. Plaintiffs argue that training records simply reflect that training occurred, and do not indicate the substance of the training. Training is also haphazard as it depends on the number of officers available to attend the training, and no performance evaluations are conducted. Plaintiffs also argue that it is not clear that training for an encounter where a suspect answers the door actually occurred. In support, they point to Perpar's testimony that he could not remember an actual encounter where this happened and that he thought it would be a bad idea for a suspect to answer the door. Plaintiffs further argue that the Sheriff's Department rarely follows its own policies as no firearms review board was established to review the use of deadly force in this case. Plaintiffs conclude that the failure to properly train and supervise the SWAT team was a contributing cause of Ward's shooting. Finally, plaintiffs argue that the failure to follow up on, investigate, and correct the problems that led to this shooting demonstrates deliberate indifference.

Defendant replies that Danaher's report consists of little more than conclusory statements

and provides no analysis of the actual training provided to the SWAT team. Defendant argues that Danaher's opinion that a better-trained officer would not have used deadly force against Ward does not suffice to prove that training was inadequate. Defendant also argues that even if the County failed to investigate in this instance, such a failure could not be a moving force behind a constitutional violation because it happened after the alleged violation. Finally, defendant argues that plaintiffs have not established a history of constitutional violations or obvious inadequacies in the SWAT training program that would prove deliberate indifference.

Upon review, the Court finds that plaintiffs have not established that the SWAT team's training or supervision was inadequate; that the inadequacy was the result of the County's deliberate indifference; or that the inadequacy was closely related to or actually caused Ward's injury. As an initial matter, the Court finds Danaher's expert report to be of little value in this case. Although Danaher's qualifications appear to be impressive, his report fails to provide any actual analysis of the County's SWAT training or other policies and instead relies on generalizations followed by conclusions. For example, Danaher states: "The [County] has in its SWAT policy the priorities of life. Those priorities of lives are hostage, innocent citizen, police, and suspect. If they had followed the policy of priorities of life, they would never have made a dynamic entry into Ward's residence risking innocent people's lives over property." Danaher concludes: "In short, it is my opinion that [the County's] SWAT policies regarding drug raids are inadequate and of little, if any use in providing guidance to [SWAT officers]." Danaher does not, however, discuss the County's actual policies, or describe what an effective policy is. Similarly, without discussing any of the training the SWAT team received, Danaher concludes that "the training given to the [SWAT team] on dynamic drug raids is at best severely flawed,

and likely almost worthless." He goes on to state that Ward's injury could have been avoided if Sparks had been trained in the three stages of combat, but fails to discuss the training that Sparks did receive. He also characterizes Sparks's justification for shooting Ward as highly suspicious and concludes that a reasonably trained officer would not have used deadly force against Ward, but does not describe reasonable training nor compare it to the training Sparks received. Finally, Danaher concludes that the County failed to "institute mechanisms for the effective supervision of the [SWAT team]" but does not elaborate on what the supervision structure of the SWAT team is and in what manner it is deficient. Thus, plaintiffs' expert report does not establish that training or supervision is inadequate.

Other than Danaher's report, plaintiffs provide no evidence that training was inadequate. Plaintiffs acknowledge that Michalosky testified that the SWAT team routinely trains for encounters where a suspect answers the door when the team is preparing to breach it, and that all operations are treated as if they might involve innocent civilians. The fact that Perpar could not remember an encounter where this actually happened or that he thought it would be a bad idea for a suspect to answer the door does not establish that the training itself is inadequate.

Plaintiffs also fail to establish deliberate indifference. Although plaintiffs argue that the "record reflects that the Sheriff's department has few governing policies, inadequate training, and virtually nonexistent supervision and oversight," plaintiffs do not point the Court to specific evidence that supports this statement. Plaintiffs point out that the 2008 SWAT Annual report did not mention the incident that prompted this case, but an-after-the-fact report has no bearing on whether the County was deliberately indifferent to an obvious need to provide adequate training or supervision prior to the incident. Likewise, the fact that Michalosky produced no report

supporting his conclusion that SWAT policies did not need to be changed following the incident does not establish deliberate indifference. Further, plaintiffs argue that the County's failure to convene a firearms review board after the incident shows that the County "rarely" follows its own policies. It is not clear, however, from the evidence provided that such a review board is required, nor would a one-time failure to convene such a board establish that the County rarely follows its own policies.

Accordingly, the County's motion for summary judgment as to count four is granted.

**C. State Law Claims**

**1. Claims Against Defendant Cuyahoga County**

To the extent plaintiffs are asserting state law claims against defendant Cuyahoga County, the Court finds upon review that the County is immune. Political subdivisions in Ohio are immune from liability for injury to a person caused by any act in connection with a governmental or proprietary function. Ohio Rev. Code § 2744.02. Providing police services is a governmental function. Ohio Rev. Code § 2744.01(C)(2)(a). Exceptions to immunity for political subdivisions include injuries sustained due to: negligent operation of a motor vehicle by a government employee in the scope of employment; negligent performance of a proprietary function; negligent failure to repair or remove obstructions from roads; and physical defects in buildings used in a governmental function. Ohio Rev. Code § 2744.02(B). An exception to immunity also exists wherever the Ohio Revised Code has expressly imposed liability on a political subdivision. *Id.* If one of these exceptions applies, the political subdivision may still establish immunity by demonstrating that another statutory defense applies. *See* Ohio Rev. Code § 2744.03. Plaintiffs have not argued that any exception to the County's immunity applies.

Accordingly, defendant Cuyahoga County is entitled to summary judgment on counts two, five, six, and seven.

**2. Claims against Defendant Sparks**

**a. Count Two: Assault and Battery**

"If an officer uses more force than is necessary to make an arrest and protect himself from injury, he is liable for assault and battery." *D'Agastino v. City of Warren*, 75 Fed. Appx. 990, 995 (6th Cir. 2003) (citations omitted) (reversing district court's grant of summary judgment to police officer on assault and battery claim where grant of summary judgment on excessive force claim was also reversed). The Court has found a genuine issue of material fact with respect to whether defendant Sparks's use of force was reasonable. Thus, a genuine issue of material fact also exists with respect to Ward's assault and battery claim. *See also Baker v. City of Hamilton*, 471 F.3d 601, 610 (6th Cir. 2006) (reversing district court's entry of summary judgment for police officers on excessive force and assault and battery claims); *Magrum v. Meinke*, 332 F. Supp. 2d 1071, 1084 (N.D. Ohio 2004) (refusing to grant summary judgment to police officer on assault and battery claim where a genuine issue of material fact exists as to whether officer used excessive force). Accordingly, defendant Sparks's motion for summary judgment is denied as to count two.

**b. Count Five: Reckless and Wanton Conduct**

The Court agrees with defendants that "reckless and wanton conduct" is not a separate cause of action under Ohio law. *See Rodriguez v. City of Cleveland*, 619 F. Supp. 2d 461, 485 (N.D. Ohio 2009) (recognizing that "there is no cause of action under Ohio law for malicious, wanton conduct"); *Cincinnati Ins. Co. v. Oancea*, No. L-04-1050, 2004 WL 1810347, *17 (Ohio

App. August 13, 2004) ("Willful, wanton, and reckless conduct is technically not a separate cause of action, but a level of intent which negates certain defenses which might be available in an ordinary negligence action."). Accordingly, defendant Sparks is entitled to summary judgment on count five.

**c. Count Six: Negligent Infliction of Emotional Distress**

Under Ohio law, a plaintiff can recover for negligent infliction of emotional distress if the emotional injuries are both serious and reasonably foreseeable. *Paugh v. Hanks,* 451 N.E.2d 759, 765 (Ohio 1983). An emotional injury is serious where "a reasonable person, normally constituted, would be unable to cope adequately with the mental distress engendered by the circumstances of the case." *Id.* An emotional injury is reasonably foreseeable where a defendant's act is likely to result in injury to someone. *Id.* at 766. Factors to be considered in determining whether a negligently inflicted emotional injury was reasonably foreseeable include the nearness of the plaintiff to the scene of the accident; whether the plaintiff directly observed the accident or learned of it afterward; and whether the plaintiff and the victim were closely related. *Id.* A plaintiff need not actually see the accident: "a contemporaneous observance of the accident through the sense of hearing will enhance the likelihood that the emotional injury was reasonably foreseeable." *Id.* Additionally, the plaintiff and the victim need not be related by blood. *Id.*

Defendants argue that plaintiffs have no claim for negligent infliction of emotional distress because plaintiffs allege that they are the victims in this case and negligent infliction of emotional distress claims are reserved for those who are not victims, but are in the vicinity of an event. Defendants further argue that Sparks was privileged to act in the manner in which he did.

Plaintiffs respond that plaintiff Sutton was in the vicinity when defendant Sparks shot plaintiff Ward in the face, as she was in the bedroom asleep at the time. Plaintiffs argue that Sutton was traumatized by the event and forced to move because of recurring nightmares. Plaintiffs further argue that defendant Sparks's conduct "reflected a willful reckless and wanton disregard for the welfare of others" and that Sparks is not entitled to immunity for such conduct.

Upon review, the Court finds that defendant Sparks is entitled to summary judgment on plaintiffs' negligent infliction of emotional distress claim. Government employees in Ohio are immune from liability for actions in connection with a governmental or proprietary function unless the employee's actions were malicious, in bad faith, or wanton or reckless.[7] Ohio Rev. Code § 2744.03(A)(6)(b). No exception applies for negligence in connection with a governmental function. Although plaintiffs argue in their opposition to summary judgment that defendant Sparks's conduct which caused the emotional distress was reckless and wanton, such an argument is inconsistent with plaintiffs' theory of negligence.[8] Accordingly, defendant Sparks is entitled to summary judgment as to count six.

**d. Count Seven: Loss of Consortium**

Under Ohio law, a minor child a "has a cause of action for loss of parental consortium

---

[7] Plaintiffs do not argue that defendant Sparks's conduct was outside the scope of his official responsibilities or that civil liability with respect to negligent infliction of emotional distress is imposed by another section of the Ohio Revised Code. *See* Ohio Rev. Code § 2744.03(A)(6)(a) and (c).

[8] Under Ohio law, reckless infliction of emotional distress is the same cause of action as intentional infliction of emotional distress. *Davis v. City of East Cleveland*, No. 1:03 CV 2075, 2006 U.S. Dist. LEXIS 11913, at *47 n.4 (N.D. Ohio March 21, 2006) (citing *Russ v. TRW, Inc.*, 570 N.E.2d 1076, 1083 (Ohio 1991)). Plaintiffs have not pled an intentional infliction of emotional distress cause of action.

against a third-party tortfeasor who negligently or intentionally causes physical injury to the child's parent. In this context, consortium includes society, companionship, affection, comfort, guidance and counsel." *Gallimore v. Children's Hosp. Med. Ctr.*, 617 N.E.2d 1052, 1060 (Ohio 1993). A loss of consortium claim is a derivative claim and is dependent upon a defendant committing a cognizable tort upon the parent of the child making the claim. *See Bowen v. Kil-Kare*, 585 N.E.2d 384, 392 (Ohio 1992).

Defendants argue that because plaintiff Ward's civil rights claims are without merit, plaintiff Sutton's claim for loss of consortium on behalf of Ward and Sutton's minor daughter Daisy must also fail. Plaintiffs argue that because summary judgment is inappropriate on plaintiff Ward's excessive force claim, it is also inappropriate on Daisy's loss of consortium claim.

Upon review, the Court finds that defendant Sparks is not entitled to summary judgment on Daisy's claim for loss of consortium. Given that the Court has found a genuine issue of material fact with respect to plaintiff Ward's excessive force claim, a genuine issue of material fact also exists as to Daisy's loss of consortium claim. Accordingly, defendant Sparks's motion for summary judgment is denied on count seven as to plaintiff Sutton as next friend of Daisy Ward.

**CONCLUSION**

For the foregoing reasons, defendant Cuyahoga County's Motion for Summary Judgment is GRANTED; defendant Sparks's Motion for Summary Judgment is GRANTED on counts three, five, and six; GRANTED on count seven as to plaintiff Jamie Sutton only; and DENIED on counts one and two, and DENIED on count seven as to plaintiff Jamie Sutton as next friend of

minor Daisy Ward.

IT IS SO ORDERED.

/s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 6/29/10